Good afternoon. This is the time set for the argument in Noguera v. Davis. Ms. Grundyke, you may proceed. Sorry, Your Honor, just to clarify, the state is actually... Oh, I'm sorry. I'm so used to the defense going. My apologies. I am too, so thank you, Your Honors. Good afternoon, and may it please the Court. Deputy Attorney General Meredith White on behalf of Appellant Respondent. If possible, I'd like to reserve five minutes of my time for rebuttal. Your Honors, the Sullivan exception to Strickland has been, in the words of this Court, specifically and explicitly limited to conflicts of interest that arise in a concurrent representation situation. A state court decision rejecting a Sullivan claim rooted in any other type of conflict cannot be contrary to nor an unreasonable application of Supreme Court precedent. And in at least five cases, this Court has already so helped. Whether the conflict here arose from Paredes' prior representation of Noguera's mother in her unrelated divorce case, or arose from her payment of his fee, or from both, makes no difference. This Court has already held that for AEDPA purposes, the Sullivan exception categorically cannot be applied to any conflict other than those born of concurrent representation. Nor does it make any difference whether this claim is analyzed under Section 2254 D.1 or D.2. Beginning with D.1, the California Supreme Court's denial of this conflict claim cannot be considered contrary to or an unreasonable application of Supreme Court precedent. The clearly indicates that Sullivan's application to any conflict other than concurrent representation remains an open question. It does appear that the district court's order may have granted relief on this claim pursuant to D.2 instead of D.1. That too was error, because the claim cannot be granted under D.2 either. First of all, this Court has already held that the question regarding whether an attorney suffers from an actual conflict of interest is a question of law. It is not a question of fact. Because it's a question of law, it must be analyzed pursuant to D.1 and not D.2. In addition to that, the district court did not identify any particular fact that the California Supreme Court reached in error. The notion that the California Supreme Court's factual error was with regard to its determination that petitioner had not shown a prima facie case begs the question in D.1. A prima facie case of what? Which is a conflict of interest that qualifies for the Sullivan exception. Clearly, this conflict does not qualify for the Sullivan exception and thus it cannot constitute a conflict of interest. So what do you make of WOOD? How does WOOD fit into our analysis? WOOD is, I think first and foremost, not even a Sixth Amendment case. It's a Fourteenth Amendment due process case. On top of that, the Court in WOOD never found that an actual conflict of interest existed there because it remanded the case for a lower court to the proposition that a conflict may exist in those circumstances. It's not clear what standard of prejudice would need to be applied, whether the conflict in WOOD would fall under Strickland or whether the conflict in WOOD would fall under Sullivan. And what the Court in Mickens makes clear is that it hasn't decided that question with respect to any conflict of interest other than concurrent representation, and it includes conflicts that arise from Assuming WOOD applies and that Sullivan isn't folded into the WOOD analysis, then what remedy would the petitioner have here? Assuming, I'm sorry. If WOOD applies in this context. I mean, your argument is that we can't go to the Sullivan presumed prejudice standard even if we adopted WOOD. So how would you apply it in this context? I think even if WOOD applies in the sense that there may exist a conflict of interest for constitutional purposes when financial incentives are at issue, again, the Supreme Court has never decided whether the petitioner would need to show an adverse impact on the representation or whether the petitioner would need to show traditional Strickland prejudice, meaning a reasonable impact on the outcome. And because the Supreme Court has never decided that question, it remains open, and the California Supreme Court's denial of this claim can't be attributed, or excuse me, can't be contrary to Supreme Court precedent. I'd note, in addition, there are a number of distinct factual distinctions between this case and WOOD. The first being there was co-counsel here. Co-counsel did not have a conflict of interest, and co-counsel was appointed by the court. The petitioner was declared indigent in roughly May of 1985, which was two years prior to the start of the trial. And from that point on, the court and the county paid all of the investigative fees and paid for co-counsel. Co-counsel has his own, and is bound by his own ethical duties. And in a situation like this, the conflict of interest, even if we can assume that it applies with respect to lead counsel Pareda, it did not apply to co-counsel. So for that reason, WOOD also can't be applied in this situation, even to the extent that WOOD may be, or applying it in this situation could be considered a logical extension of WOOD. The Supreme Court has been very clear that that's not enough, and that until they render the decision indicating the standard that applies, the state court's denial of the claim cannot be considered contrary to Supreme Court precedent. I think the same analysis applies with respect to all of the ineffective assistance of counsel claims. And from, again, the district court's order does not include a separate independent analysis of these IAC claims. Instead, it granted relief on the claims because it considered them to be integrally related to the Sullivan claim. The problem there is if the petitioner hadn't been entitled to relief under Sullivan, there would have been no need to grant relief on any other claims because it would have required reversal of the entire case. As I read the district court's order, it appears that the district court applied Sullivan to the Scripton claims, which we know the district court cannot do. Now, so that would not apply to the penalty phase claim, though, which it does not relate directly to the conflict of interest. And I'd appreciate your addressing that claim, the lack of investigation and mitigation. Certainly. The penalty mitigation investigation, I think first and foremost, the allegations that counsel was deficient for failing to investigate mental health and to investigate his family background. The problem there is petitioner's own declarations indicate that there was no need to conduct any investigation because counsel already knew everything. Both petitioner's mother, his sister, and his wife at the time indicate that counsel was fully aware of everything. The wife indicates she had a lengthy interview with him regarding mental health issues. So if in fact we take his declarations at face value and take them as true, there was no need to conduct an investigation because counsel had already been made aware. In addition to that, couldn't it also be viewed that the information that counsel knew put him on notice and required additional investigation in the capital case that counsel would be held at a higher standard? And given what information he had, perhaps he should have hired experts and had an evaluation of the petitioner. I don't think that's borne out by the record. So are you suggesting that what is stated in petitioner's mother's declaration about the family relationship and the issues with petitioner as he was a child and what Mr. Paredes said he knew about, that's the extent? I mean, I thought post-conviction counsel unearthed more evidence that could have been used in mitigation that could have been determined through an investigation. The evidence that has been alleged with respect to the penalty mitigation falls into, I think, four broad categories. The first is evidence of organic brain damage. But I would point out that even still today, petitioner has never been diagnosed with organic brain damage. His own expert could not say that. So his first expert said there was a significant possibility. The second expert said she could not issue a definitive diagnosis. And the third expert, the neuropsychologist, indicated that he scored a 0.4 on the test designed to impairment. And she says in her declaration that that can be indicative of organic brain damage. But again, even today, we have no evidence that in fact petitioner does suffer from organic brain damage. But aren't those possibilities enough potentially to sway a juror to spare his life? Isn't that the test? He doesn't have to prove anything by a preponderance or any other way in mitigation. It's what would be the effect of this additional information on a single juror who might wish to spare his life. So I'm not really sure what difference it makes that he doesn't have a definitive diagnosis. I think the standard here is whether fair-minded jurists could disagree about the impact this evidence may have had. And likely that it would have swayed jurors in a different way. I think we also need to remember to take into account the tactical strategic reasons why this evidence would not have been presented. Well, I can understand why it wouldn't be presented at the guilt phase, which had a whole different set of theories. But I don't, I see no reason why all the mitigation evidence wouldn't and shouldn't have been presented at the penalty phase. One thing courts have recognized is an attorney's duty and obligation to craft a strategy in a death penalty case that integrates the two phases. And in order to present the evidence that has been presented at the previous petition, at the penalty phase, it would necessitate admitting that the petitioner was involved in the murder after an elaborate alibi defense. Well, yes, but that alibi defense fell apart unexpectedly from the point of view of the defense. Once that happened, all bets were off. And it seems to me that the most plausible way to web those two things is to say, well, now we have a potentially different strategy at the mitigation phase that does, you know, concede that their alibi witness wasn't a good witness for them anymore. Even in that scenario, I think presentation of this evidence during the penalty phase, it is not even necessarily mitigated. The evidence petitioner has put forth indicates that whatever his particular mental health issues are, that they lead to an inability to control his emotions, explosive rage, and aggressive violence that he can't control. This was a defendant who was coming into the penalty phase with absolutely no criminal history and a significant positive light defense for penalty purposes to then put on evidence that suggests he is prone to and violent outbursts would undermine the benefit of his lack of criminal history, and could very easily be seen by the jury as aggregating, not mitigating. And in addition to that, a reasonable attorney could have concluded that, which means a reasonable attorney could have decided not to put the evidence on. And even beyond that, the California Supreme Court cannot be a reasonable probability of resulting in a different penalty outcome. In addition to that, there were a number of items of evidence that, in fact, his file attorney worked very hard to keep out of the penalty phase and successfully did so. He had a history of smuggling drugs into jail during the pendency of this trial, and including his own mother who smuggled drugs into the jail. And the prosecutor repeatedly looked for opportunities throughout the penalty phase where defense counsel opened the door such that he could present that evidence. He was the mastermind of an elaborate escape plan. That's also included in his jail records that were available to both counsel pre-trial. Those are the types of things that his trial attorney had to be mindful of in terms of, yes, maybe I can put forth this evidence, but what am I opening the door to? Petitioner's own declarations indicate that, in fact, he had had a number of these violent episodes while in jail and had attacked other inmates for seemingly no purpose and without any provocation. Again, if any of this is presented, the trial attorney has to be mindful about what doors are being opened and what evidence might come in in rebuttal. And again, that's just the first layer of deference that is owed to this particular decision. But there's really no evidence in the record that all of that was a strategic decision. Now, had counsel investigated, counsel might well have made a strategic decision not to go forward, but I think that the difficulty here is that counsel didn't do any investigation, even though he was on notice of potential mitigating evidence. I think what we can tell definitively from the record is he did know about the incidents in jail, the drug smuggling, the escape plan, because all of that was included as a court's exhibit in the trial record, and they discussed it on the record. So he absolutely knew about that. To the extent that Petitioner may argue there was a duty to investigate, again, his own declarations indicate that counsel was fully aware of all of this information, which would suggest there was no duty to investigate, because he knew the type of evidence that might come about and made a strategic decision to go in a different direction. And once he made that strategic decision to go in a different direction, his duty to investigate was at an end. And again, that's just the first inquiry under Strickland. The second one being, was there a reasonable probability a jury would have been persuaded to not give the death penalty if this evidence had been presented? And I think the answer there has to be no, because as it stands, the penalty mitigation indicated that Petitioner had a loving family, that he had been successful as a student. He had several awards for perfect attendance in music. He had all of the hallmarks of a good upbringing. He had a number of family members come testify about their love for him, and that could garner sympathy. It gave Defense Counsel the opportunity to argue that he has all the support necessary, right? He's made all of these contributions to society through art and through music. This was an aberration out of the ordinary. Let's not impose the death penalty for one aberration. If any of this additional evidence had been presented, counsel could not have made that argument. And in fact, counsel effectively would have been admitting that there was a high likelihood that he could go on to commit future crimes. I think when we view this through the lens of prejudice and Strickland and again, the inquiry here is could fair-minded jurists disagree about that? And if the answer is yes, he's not entitled to release. Here, the California Supreme Court could very reasonably have concluded that even if all of this evidence had come in at the penalty, the jury was not going to be persuaded to give him life. And for that... The jury asked a question about weighing aggravating and mitigating circumstances. And the only aggravating circumstance was the attempted car theft. And his mitigation was what you described his attorney presented as the theory. But if his attorney had tried to present this evidence in mitigation, wouldn't there have been a couple of other mitigation factors that the defense could have considered? The question about weighing the aggravating and mitigating circumstances suggests that a reasonable juror could have decided on life without possibility of parole rather than death. Certainly, I would just add that in addition to the to the robbery as an aggravator, the circumstances of the actual offense, that was something that the jury could and did consider with respect to aggravation. But with respect to mitigation, it may have given counsel the existing mitigating factors that counsel had worked in his favor. And so I think on balance, it's not clear that the end result would have been different. And certainly the California Supreme Court cannot be said to be unreasonable for concluding that a different tactic would not have worked out any differently. So even if all of it had been presented there, I think there's no reasonable possibility that the jury would have reached a different conclusion. And fair-minded jurists, I think, could certainly disagree about the value of that mitigating evidence and the likely impact it would have had on this jury. I think if the court has no further questions at this time, I'd like to reserve the remainder of my time for rebuttal. Can I ask you one question? With respect to claim 10, I have a question with how the procedural bar may or may not apply. And in your briefing, you indicate that you asserted that the claim was barred by timeliness. It was untimely, it was repetitive, it was successive. But I didn't see a site to the record where those objections were made before the district court. Can you point me to that? Where they were raised? Right, because your briefing on appeal says that they were raised in the district court. And obviously there was quite a bit of briefing over on the issue of whether the procedural bar was waived with respect to claim 1. And without finding where the objections with respect to repetitiveness and successive claim were raised in the district court, I'm wondering if that's barred as well. And just from my memory, it would have been in our motion to dismiss, which was filed in 2009. I can certainly find the specific reference citation. And my recollection is that we raised an untimeliness objection. I think that sort of is viewed, the untimeliness objection is viewed to encompass a successive objection because the California Supreme Court has said when a claim is denied as successive, it's sort of inherently untimely. Those two are in some ways one and the same. And the same would be true with respect to repetitive. If it's repetitive, it's untimely because it was available to you at an earlier time. I will certainly find the specific citation from the motion to dismiss with respect to claim 10. And I think claim 10, because it was originally raised in his first state habeas petition in 1992, is one of the claims that is partially barred. Meaning when it was originally denied in 1992, it was not denied as untimely, it was only denied on the merits. So the record would just be limited to what was before the state court in 1992. But I will certainly get that information for you. Thank you. Thank you. Thank you, counsel. Now, Ms. Grondyke. Sorry for the earlier confusion. Good afternoon, and may it please the court. Emily Grondyke on behalf of Petitioner of Pelley, William Noguera. As a teenager, Mr. Noguera and his girlfriend, Dominique, killed her mother, who was abusive. Mr. Noguera's mother hired her former divorce attorney, who had never litigated a capital case, to represent him on trial for his life. And that attorney has now represented several important things. First, he never investigated Mr. Noguera's mental health or the mental state involved in the crime. Second, he never investigated the supposed financial gain motivation of the crime, the only alleged special circumstance here, and he had no strategic reason for that. Third, he never investigated any kind of mitigation, aside from good person, good family mitigation. And finally, and this colors everything that came before, he acknowledged that he had an undisclosed and unwaived conflict of interest. Now, conflict of interest and Strickland are distinct legal claims, and there are distinct Mr. Noguera's conviction, special circumstance finding, and death sentence are the results of an extreme malfunction of the legal system. I'll... What's reasonable isn't really necessarily the question. The question is whether the Sullivan Standard applies to conflicts of interest that are not concurrent, but are serial in nature and that relate to different kinds of representations. So that really is a legal question, not a factual question. So what's your response to the state's argument about Mickens v. Taylor and the rest of their arguments about why it's not clearly established that the Sullivan Standard would even apply here? Yes, Your Honor. I think the warden overstates the holding of Mickens, and here's why. Wood v. Georgia was an application of Sullivan. It cited Sullivan, it discussed Sullivan, and it applied that standard, active conflict that adversely affects the representation. That's the standard that Wood v. Georgia, the Supreme Court, remanded to apply to that claim. So our position is that Wood v. Georgia clearly establishes that Sullivan's standard applies when an active conflict is created by a third-party representation agreement, and not any third-party representation agreement, but one in which counsel's loyalties are pulled between the differing interests of the person paying and the person being represented. Now what Mickens said is not that every possible kind of conflict is still an open question. Mickens said specifically that there's an open question regarding successive representation. Right, which is what we had here. Well, no, Your Honor. Our position is that because counsel was representing the interests of the person paying him, simultaneously with the interests of Mr. Noguera, exactly what was and it clearly establishes that Sullivan applies. Now in Mickens, the Supreme Court discussed Wood v. Georgia as an application of Sullivan, discussed it with approval. So to say that the Supreme Court... Let me understand your position. Your position is that this is not a serial representation, but is a concurrent representation? The third-party agreement, because of the conflicting interests that were created in this specific instance. I don't understand that. You're saying that... I'm trying to understand if you're arguing that this is, in fact, concurrent representation, and if that's your argument, I don't see that. Well, Your Honor, just as in Wood v. Georgia, the attorney was simultaneously representing the company that paying, that retained him, and the defendants who were on trial. But how could he be representing the mother? There was no legal case of any kind involving her in any way, civil or criminal. Well, the same is true in Wood v. Georgia. The company that was paying counsel was not on trial, was not charged with criminal charges, was not facing parole revocation. Nonetheless, they were the client that was paying the bills, and counsel had a conflict between the interests of the person who retained them, and the people who were being represented. And that's the same thing that happened here. Well, in that... And would the court raise the issue of the conflict that said, this hasn't been briefed, and we're not going to decide this in the first instance, and then remand it to the district court, because the facts that would establish whether there was really a conflict had not been put into the record. So certainly, they recognize the possibility that there could be a conflict based on that third-party key agreement. Here, though, we have the record. We have Mr. Paredes' declaration, his full counsel's declaration. We have Petitioner's mother's declaration, and a host of other family members. But the two that seem the most key are Sarita Nurega's declaration and Mr. Paredes' declaration. But Mr. Paredes, as far as I could see, and I've read the declaration several times, I just don't find anywhere where he says anything about Mrs. Noguera paying him, or how that impacted his representation. When he talks about a conflict, it seems clear that he's talking about his prior representation in the Gula Gores proceeding. So he's talking about a potential conflict in successive representation of the agreement. And if you read the declaration differently, I would like you to point me to where it is, what language it is you're relying on. No, Your Honor, I don't read it differently. I don't think Mr. Paredes makes that connection. But this court has also held that we don't look to counsel's admissions about the effects of a conflict of interest. It is up to the court to look at the record to evaluate whether there was an adverse effect. And the court said... Counsel, that's actually, to me, somewhat problematic here. Because both of the lawyers, both Mr. Paredes and Mr. Campos, talked about what went wrong. And they both seem to, neither one of them discusses in any way the fee arrangement or the successive representation as having any effect on their poor performance, which they're pretty ready to admit just because they weren't experienced capital counsel. It seemed to be what they were saying is, we weren't any good at this. So there's really no evidence. Plus, they had a very reasonable strategy at the guilt phase because they had an alibi witness. So it's hard to see what effect on this record, what effect there was at least in terms of their strategy. I'll say two things about that, Your Honor. First, the effects of a conflict of interest subtly ripple through the entire representation. And that's why courts don't look to counsel's admission of the effect. As this court said in United States v. Shwader, human self-perception regarding one's own motives for particular actions in difficult circumstances is too faulty to be relied upon, even if the individual reporting is telling the truth as he perceives it. But given the alibi witness, what difference could it have made? There was a reasonable strategy to follow regardless of who was paying the bills or what their interest was. They had a witness to say he didn't do it, he wasn't there. So our position is that an alibi presentation was not reasonable in this case. And the reason, there are a few reasons for that. First and foremost, it was an uninformed decision. Trial counsel didn't investigate any other approach to the guilt phase trial, as he acknowledges, did not investigate Mr. Noguera's mental state. There's another particular reason in this case why the alibi was not a reasonable strategy. And that's because there was substantial dispute about the time of death in this case. The estimates of time of death placed it between 1230 and 330 a.m. So counsel's selection of an alibi that put Mr. Noguera home from 2 a.m. on wouldn't even preclude the possibility of his being involved in the homicide. So there may be circumstances when an alibi is reasonable. But in these circumstances where nothing else was evaluated, the alibi was nonetheless a particularly shaky choice. Now, the failure to investigate mental states in this case was also dubious because counsel recognizes in his declaration that he thought the evidence of premeditation was weak. Finally, an alibi required counsel to ask the jury to reject all of the evidence of identity. And as the district court correctly recognized, that evidence was strong. Mr. Noguera, the prosecution presented evidence that tied Mr. Noguera personally to the rather unusual murder weapon and tied his teeth to injuries on the victim's body. Now, with those two pieces of evidence of identity, it can't be said that counsel could reasonably reject any other guilt phase presentation without even investigating them. So is it your position that he should have gone straight to the penalty phase and said, you know, he did it, but show mercy? Or what are you suggesting would have been a different strategy? Counsel should have investigated a guilt phase mental state defense, argued in favor of a lesser included offense such as manslaughter or second degree murder, argued that this homicide happened in the heat of passion, or at least without premeditation. That would have been better not to pursue that theory, given the testimony of the meeting at the Bob's Big Boy a few months before the murder in which the petitioner and his girlfriend talked to the witness about the murder and offered him $5,000 and a place to live, et cetera, which was pretty strong evidence of premeditation. So given that evidence, I mean, it seems reasonable that choose to do a heat of the moment passion defense. Well, counsel, in fact, in his declaration says that he viewed that evidence as weak. So that was not his approach. Now, the other thing about that to remember is, and if you're interested, Your Honor, I can provide you the citation for that. That's in the... Well, he attacked the credibility of the witnesses he had to do, but I don't think he said anything about discounting the significance of that testimony. Yes, Your Honor, at the excerpts of record 1148, he says, although there was evidence of from Ricky Abrams testimony of premeditation and deliberation, it was weak. So we know that wasn't the basis for trial counsel's decision, but it's also worth remembering that that wouldn't justify his selecting an alibi presentation, because asking the jury to believe in alibi would also require them to reject Ricky Abrams testimony. The evidence of premeditation is also... So from what you've outlined, we are then to conclude that his representation must have been affected by the petitioner's mother paying his bills, even though he never says anything about that. And the only source of that is her declaration in which she perjures herself or she committed perjury at trial, because the two bits of testimony are in direct conflict. And so we have her speculation about what Mr. Parada understood or knew, which is not admissible evidence, against him not saying anything at all about that, even though he was essentially, frankly, confessing error at the trial and apparently cooperating with post-conviction counsel in providing a declaration. Well, so the allegations in Ms. Salinas' declaration were supposed to be presumed true by the California Supreme Court. And those allegations, again, are relevant to all of our analysis of trial counsel's strategy. But even if they're presumed true, they established that she truthfully speculated about what he knew. Well, I believe that she also says that Mr. Parada agreed or understood the condition. Mr. Parada agreed, which suggests a representation on his part to her, that her suggestions about the defense should be heeded. But, Your Honor, again, even setting aside everything that Ms. Salinas says, the Strickland claims are an independent basis on which this court can affirm the district court's grant of relief. And I think we demonstrate, even without Ms. Salinas' declaration, that the state court was unreasonable for denying these claims. The strongest argument for that, I think, is the Strickland claim about the failure to investigate the financial circumstances. Trial counsel acknowledges that he had no strategic reason for that omission. And that takes this case right as a straightforward application of Rompella v. Beard. In that case, the Supreme Court said that trial counsel was deficient for failing to investigate something that it knew would be at the heart of the prosecution's case for death. The same is true here. It doesn't take the benefit of hindsight to know that you should investigate the only circumstance rendering the defendant eligible for the death penalty. And the Supreme Court, in that case, said not only that trial counsel was deficient, but that any alternative conclusion would be unreasonable within the meaning of 2250-14. And the same is true here. The California Supreme Court concluded that Mr. Noguera made no prima facie showing of a Strickland claim here. There's simply no reasonable way it could have reached that conclusion. I'd point the court in this regard to White v. Ryan. In that case, this court found trial counsel deficient for failing to investigate a financial gain aggravating circumstance. And in that case, the evidence supporting the financial gain circumstance was much stronger than what was available here. Here, there was very little evidence supporting the financial gain special circumstance. Primarily, it was Mr. Abrams' testimony that Noguera told him Mr. Abrams could have some money after the death. But the jury wasn't presented with any other explanation for this homicide at all. If the jury had heard, as was available, the evidence that Dominique was being sexually abused and exploited in her home had been for years, and that she was pressuring Mr. Noguera for an escape, that evidence could have come on top of what the prosecution witnesses already testified about Ms. Navarro's insistence that Dominique have an abortion, even though she and Mr. Noguera did not want that. They wanted to have a baby. Testimony that Ms. Navarro had threatened to hire a hitman to kill Mr. Noguera. If the available evidence of Dominique's abuse had been put together with that, there's a reasonable probability that the jury would have concluded that there were emotional reasons. The heat of passion is what motivated this homicide, not financial gain. I do want to turn briefly to the procedural bars before I run out of time. Walker v. Martin said that the procedural bars in California, the Timeliness Bar, was established by a trilogy of cases, Clark, Robbins, and Gallego. The first petition in Mr. Noguera's case was filed before any of those cases, and traditionally, the Ninth Circuit has held that the filing of the initial petition is the relevant date for evaluating. But, even if this court agrees with the warden that a later date should be considered, that date would be the date of the filing of the subsequent petitions. Here, Mr. Noguera's second petition, which included all of the relevant incidents, was filed before the last two cases of that trilogy, before Robbins and Gallego. Even if we're evaluating adequacy as of the dates of the filings of each petition, only those things that were brought in new with the third petition would be barred, because only that petition came after the trilogy of cases that framed California's ruling. Let me ask you a question. This is relating the procedural bar issue to the issue you were just arguing earlier about a Strickland claim of failure to investigate the financial gain motive more fully. Which claim number is that Strickland guilt phase claim, and when was it raised, and how does the procedural bar apply if it does? So, that was claim six and seven. They got combined. That was primarily raised in the first state petition, and the warden concedes that the things in the first state petition are not barred at all. So, that's the 1992 petition? Yes, Your Honor. There were some additional exhibits cited in support of that in the second state petition, which was filed in 1998, before Robbins and Gallego. So, nothing that is cited in support of that claim was raised in the third petition, which would be barred if the court is evaluating things that happened after the trilogy of cases. So, to summarize, Your Honor, the only two claims that we're discussing in this petition that are raised in that third petition are portions of the evidence that support the conflict of interest and portions of the evidence that support the IAC penalty claim. However, of course, the warden has waived the application of the timeliness bar to the conflict of interest claim. So, if we look at the things that are barred because they were raised only in the third petition, it's just a subset of evidence relating to IAC penalty. What about a bar for repetitive claims? The California Supreme Court cited that as well. Was that an adequate bar? I mean, Clark was talking about timeliness requirements. Our position is the warden's waived that bar by failing to assert it here on appeal. The warden has not argued that as a bar to any of Mr. O'Garrett's claims. I want to say one thing that applies to all of the... Wait, I'm sorry. I just have to go back because I was just focusing on what you said. Your position is that that is waived because the state didn't raise it on appeal, but they did My question to your opposing counsel was, did they raise it in the district court? So, I just want to make sure we're clear. Is your position that they did not raise it in this appeal or that they didn't raise it below the district court? I believe they didn't raise it in the appeal or didn't meaningfully argue it as a bar to the claims. As for the district court, I do believe that they asserted it to some but not all of the claims and not claim one, the conflict. Thank you. As to all of the Strickland claims, the warden has argued that the district court improperly granted those claims by applying the standards of Sullivan and presuming prejudice. I think the record shows that's not what the district court did. If the district court were presuming that Strickland claims should be granted because of the conflict, the district court would have granted every Strickland claim that Mr. Noguera had. In fact, the district court denied numerous of Mr. Noguera's Strickland claims. And in particular, the district court, in regard to some claims, assumed deficient performance and denied on the basis that Mr. Noguera made an inadequate showing of prejudice. So, that makes clear that the district court was not making a blanket presumption of prejudice, as the warden has suggested, in regards to the Strickland claims. The district court discusses the law regarding Strickland and the doubly deferential evaluation of Strickland claims under IHPA in its decision. And so, there's no reason to think it was improperly applying the Sullivan standard to those claims. There are a few last things I want to say about the IAC penalty claim. First, I'd say that the warden misrepresents the available mental health evidence for Mr. Noguera. The neuropsychologist, whose declaration is in the record, says that the test results indicate that Mr. Noguera suffers from impairments in executive function and says that those are related to frontal lobe impairments. So, to say that no expert has held that Mr. Noguera has any problem, I think, is a misstatement of the record. And, of course, counsel didn't know about that or any of the available mental health evidence because he never had Mr. Noguera evaluated by a mental health professional. As for what Mr. Noguera did know from his representation of Ms. Salinas during the divorce, I think the question is, would a reasonable attorney have investigated further based on what he knew? That's what the Supreme Court said in Andrews versus Texas and Wiggins. Based on the red flags that he had, should he have gone further? And in this case, the answer is yes. Now, as for the question of admitting evidence at the penalty phase that might have sort of reversed what counsel had done at guilt phase, again, trial counsel says that was what motivated his strategy. He says there would have been little evidence not to bring in the facts about Dominique, the facts about her abuse at the penalty phase, at least, because the jury had already found Mr. Noguera guilty. And the last thing I'll say about that is that regarding the questions about conflict with what trial counsel did present at trial, much of the available evidence could have been presented without conflicting with trial counsel's chosen strategy. That is, to the extent that trial counsel showed that Mr. Noguera was a good person who participated in school and extracurricular activities, evidence that he suffered from brain damage and child abuse would not have conflicted with that. In fact, it would have made it a more compelling presentation that someone who had brain damage and trauma nonetheless works hard to the abuse that Mr. Noguera suffered, it would have undermined the idea of family sympathy. But in this case, the family sympathy argument was quite weak, given that Mr. Noguera's mother had already testified in the guilt phase, and that testimony had been rejected. In fact, the prosecutor argued that Mr. Noguera's mother was entitled to no sympathy because of her participation in the guilt phase testimony. Your Honor, I think I'll just emphasize, as to all of the Strickland claims, that a few things. Trial counsel's failure to investigate rendered all of his decisions uninformed, and that undermines the entitlement to any deference that trial counsel has. This Court has repeatedly said that investigation has to inform strategy, not the other way around. That presumption that we usually afford trial counsel goes away with the lack of investigation. And the conflict of interest here, even if we don't believe Ms. Salinas, the conflict of interest that trial counsel admits, based on his successive representation, further undermines our presumption that counsel was acting reasonably. I think this case falls neatly within what the Supreme Court did in Rompilla v. Beard, because trial counsel failed to investigate things that he knew would be central at trial. It falls within Wiggins, because trial counsel, in light of red flags about available mitigation evidence, trial counsel didn't investigate further. This Court can affirm the District Court's grant if it is supported by the record, independent of the conflict claims. I urge this Court to affirm the District Court's grant of relief. All that Mr. Noguera needs to show in order to be entitled to relief right now is that this verdict, this trial, this special circumstance finding, and this death penalty are not worthy of our confidence. The facts alleged that were supposed to be presumed true in the California Supreme Court, the fact findings that the District Court made that the Warden has not even argued are clearly erroneous. All of those provide ample basis for this Court to lack confidence in the outcome of these cases. Thank you, Your Honors. Thank you for your argument. We'll hear rebuttal. Ms. White? Thank you, Your Honors. I want to start first by answering Your Honor's question with respect to where to find the procedural bar in the record. That's as to Claim 10, and it's in the second volume of the excerpts of record from pages 314 to 316. And I misspoke. It was a 2012 motion to 2009. Moving on to the defense offered at the guilt phase, I think to say that the alibi defense was unreasonable is a bit of a stretch. I think if we just sort of look at this holistically, the story that would have to be told with a mental health defense at the guilt phase is, yes, there was this conversation where it was planned six weeks prior, but that was somehow abandoned. Then, in an explosive rage, he kills the mother, and it just so happens that he kills the mother in exactly the way they discussed six weeks prior. So, I think in addition... So, I thought, could I... I know I'm interrupting your train of thought, but there's one issue that I'd appreciate your addressing, and that is counsel's argument that under a straight, strickland analysis, regardless of any conflict of interest or not, the failure to investigate the financial gain motive was ineffective and prejudicial and should go forward. So, what's your response to that specific argument? So, first, the failure to investigate the financial gain, what counsel indicates in his declaration is that he thought the evidence of financial gain was weak. That was a point in his favor, because the argument of the defensive alibi undermining what the prosecution is indicating as the motive for this particular defendant to commit this crime. But what would he have uncovered with further investigation, and would it have been helpful? I believe Petitioner's argument is that he would have uncovered the abuse of his co-defendant, Dominique, and what I would say there is even if he'd uncovered the abuse of Dominique, in order to put that evidence on, he would be adding additional reasons that these two people would want this woman dead, which strengthens the prosecution's case. It doesn't weaken it. Except, though, it takes away the special circumstance. I mean, if it strengthens the case in terms of premeditation, it doesn't necessarily negate the financial circumstance, and if they're plotting to take the mother's life because she's been abusive, that takes the death of the mother. Those two questions are answered in the same proceeding, the guilt phase and the special circumstance, so counsel would have to put on an alibi defense. No, no, that's, but I think, maybe I can ask the same question in a different way. If, just as a matter of law, if the jury concludes that the reason for a murder was abuse, physical and psychological and sexual, with all and that that was the sole motivation, is that a death penalty eligible conviction or not? It is not. Now, that said, in order to put on the evidence about that motive, Dominique would have to take the stand, and one of the gifts Dominique gave to this defendant at trial was her refusal to testify. She had given two statements to police in the months between the crime and when she was or, excuse me, the crime and when trial began, where she confirms there was a meeting at Bob's Big Boy. She confirms she was there. They discussed fixing her mother. She talks about her role was going to be to run screaming out of the house to the neighbors, and she confirms that it was, they were going to shoot her with a shotgun, which corroborates the testimony from Abrams, even though that isn't ultimately how the victim dies in this case. So, again, putting her on the stand means those two statements would have come in, and effectively, her refusal to testify kept them out, which means the evidence of premeditation and deliberation would have been that much stronger. I think we have to consider that. But he would, he would not have been eligible for the death penalty, according to what you said earlier. That would only be true if, in fact, the evidence of the abuse could overcome the existing evidence of the financial motive. It's not as though the prosecution then doesn't get to argue and put on the evidence regarding the financial motive, and the law in California is that it only has to be one of the motives. I think the evidence showing that they... But wouldn't this have been a very strong argument to say, well, that's just a flaky theory, because the real reason is he was protecting the woman he loved, and that's the obvious and only motivation. That would be true, except it would, again, necessitate an admission of guilt, which was the entire purpose of pursuing the alibi defense. There's... I don't know about that. I mean, for example, if he had investigated and made a strategic decision, perhaps, but if he'd investigated and said, in fact, he says that, if I'd known about this, I would have put it on. And then you described, you put on this impestuous relationship, and it's not necessarily... He could have said, this is terrible, this is awful, she had abuse, she tried to kill me, put a hit man out on me, or she wanted to hire a hit man on me, but I didn't do it. Now, the jury would disbelieve that, I think, but he wouldn't get the death penalty, probably. I mean, it's hard for me to say that, if the only special circumstance that makes him death eligible is financial gain, and you don't investigate that, that's a reasonable strategy. I think it's not as though he didn't investigate the financial gain, special circumstance, in terms of what the prosecution had to offer, but whether or not he should have motives that may have been out there, again, that would have required him to say, he didn't do it, he wasn't there, he's got this rock-solid alibi, but just in case you think he did do it, he had lots of reasons to want her dead. And this court and the Supreme Court have both said that counsel does not need to pursue theories of the case that are contradictory to one another, and we cannot hold this particular attorney to be unreasonable for his failure to pursue evidence that's But he doesn't know that if he doesn't investigate, and he can't make a reasoned decision of any sort, strategic or otherwise, if he doesn't know what his options are. That's the problem. I think what the Supreme Court has said is counsel has to conduct investigation to the extent that it is reasonable, and at a point has to make a decision about which strategy to pursue, and once that decision has been made and it is reasonable, then his duty to investigate is at an end. Here, the other point about the alibi defense is that the defendant gave a statement to police immediately after this murder, and by the time eight months later, counsel is brought in, he's boxed in by the statement, the alibi statement the defendant gave. So in addition to that, he would have to admit that the defendant lied to police officers in the aftermath of this crime. I think it was... Just one further question along those lines. I mean, if he had discovered this additional evidence and put it in and laid out the whole awful relationship and the abuse and the fact that the mother was trying to move away and considered getting a hit on him, if he put that in and asserted an alibi, when the alibi fell apart, he could have reasonably argued a second-degree murder or a lesser-included offense, right? I think certainly that is one option that an attorney may have pursued, but again, I don't think that's the only constitutionally permissible option, and what he did here was absolutely reasonable. I would also say that Strickland is an objective test, so whatever his motivations for making certain decisions, subjective motivations were, is irrelevant, because in the end, he chose a defense that was objectively reasonable. I think if he put on the evidence of Dominique's abuse, through Dominique, that's the only way he could have gotten it in, and in addition to her abuse come her two statements that confirm this was premeditated and deliberate, I think we'd be here having the same conversation, that that was ineffective assistance of counsel. And if that's true, the California Supreme Court's decision here cannot be considered contrary to Supreme Court precedent. The alibi defense was by far the strongest defense. I think any additional evidence about reasons they wanted her dead could have been seen as just bolstering the prosecution's case. With respect to the abortion, I just want to point out that the defendant testified, and it seems fundamentally unfair that we can now credit this new version about how nobody wanted the abortion when what he said at trial was everybody had agreed to the abortion. So he either perjured himself at trial, or in these hate-based proceedings, and the idea that we can turn back the clock to pursue a defense that was contradicted by the testimony of the defendant himself and all of his defense witnesses at the time of trial, that the California Supreme Court's rejection of that claim cannot be considered contrary to Supreme Court precedent. I would just add, with respect to the procedural bars, Robbins is the case that holds that California's application of Clark, the timeliness bar, that's what Robbins says now it's independent. So the relevant date is not when the petitioner raises it. The relevant date is when the court applies it. The only thing that was left was whether or not it was adequate. This court had determined it was not, and what Walker teaches is that it was adequate. So with respect to the procedural bars, the fact that his second petition was filed before Robbins doesn't make any difference because the Supreme Court denies them citing Robbins in 2001, meaning we're now saying it's also independent of federal law. And back to claim 10, I would just point out that the Supreme Court's decision in Berger v. Kemp demonstrates very well why the California Supreme Court's denial of this claim cannot be considered contrary to Supreme Court precedent. In Berger v. Kemp, the mitigation evidence found in the habeas proceedings is very similar to that here. It was a poor upbringing, evidence of early drug use brought on by a parent, there was some indications of abuse, none of which was put on in his penalty phase. In fact, that attorney didn't put on any evidence at all, despite two opportunities to do so. And the Supreme Court in Berger v. Kemp said that was not unreasonable, and they did not find efficient performance. I think if you use that, Berger v. Kemp, the California Supreme Court's decision denying claim 10 cannot be considered contrary to Supreme Court precedent. Unless the court has any further questions, I see I'm long out of time, I apologize. No, the case, thank you, counsel. The case to start, you'll be submitted for decision. I want to thank both of you. These are very difficult cases and complicated factually, and thank you for being prepared today and for your briefs. And with that, the case to start, you will be submitted for decision, and we'll be in recess. Thank you, Your Honor.
judges: Thomas, Graber, Bade